Bentley, J.
The petition filed in the court of common pleas originally contained two counts and asked personal judgment upon the note and mortgage. The praver for personal judgment was stricken out, and the decree upon the mortgage simply asked.
The petition is in the ordinary form for the foreclosure of this mortgage for the principal of a note given by Michaél Kelley on August 16, 1888, for $200, and bearing 8 per cent, interest payable annually, and upon which interest is credited in the petition to August 16, 1892, it being averred that after the making and delivery of this note and mortgage to one Geo. E. St. John, it was, for a valuable consideration, assigned to the plaintiff in this action, who now seeks to foreclose the mortgage.
An answer was filed, and afterwards, probably on leave, an amended answer of Michael Kelley was filed in the case. He denies that he is indebted to the plaintiff in the sum of $200, or in any sum whatever. Then the answer substantially sets up that upon June 9, 1891, he paid to Geo. *809 E. St. John, the original mortgagee, the sum of $150, which he says was in payment of the interest then due on the note described in the plaintiff’s petition and in part payment of the principal.
That on December 9, 1891, he paid to said St. John the further sum of $130, which sum was in full payment and discharge of the note described in said petition of the plaintiff, and^the balance of the $130 was to be applied on another note held by St. John against him.
The answer then avers, in substance, that at the time these two sums were paid to St. John, he represented that he was then and there the owner of this mortgage and note, and that after the $130 was paid, he would get it and deliver it up to the defendant, and that the defendant, at that time, believed St. John was the owner of the note and mortgag.
The answer further states, in substance, that in fact, at the times when these two alleged payments were made, St. John was the agent of the plaintiff, Mrs. Hitchcock, and entitled to receive and collect this money, and that he had, in fact, received this money as the agent of the plaintiff; and not only that, but that at the time he received it he representd that he was still the owner of the note, and he therein and! thereby acted as the authorized" agent of the plaintiff and instructed so to do. These allegations of the answer were denied in the reply and the issues were thus made us.
It will be noticed from the dates of these alleged payments, the note being for three years after its date, that at the date of the first payment, the note, by its terms, had not fallen due, but that at the date of the last payment of $130, it had fallen due, the noté being, as I have said, given in August 1888, and running three years, falling due by its terms August 16, 1891, one of these payments being made in June, 1891, and the second in December, 1891.
The question presented by the testimony and evidence introduced was, first, whether these payments, or either of them, had in fact been made by Mr. Kelley; and, secondly, whether, if made they were made to th agent of the plaintiff authorized to receive them at the time they were made.
St. John testified that these payments were made at the time set forth in this answer of Kelley, but Kelley himself, though present at court, was not called upon to state the date nor the amount, nor the fact of these payments, though he was finally called in rebuttal of certain matters. But the greater controversy occurred over the question of the actual authority of St. John to receive these payments at the time he received them, as he says for the plaintiff and as her agent. It is not claimed that at the time these payments were made, he had possession of this note and mortgage, in fact, the contrary appears, that about the time of this assignment of them they were delivered to Mrs. Hitchcock and remained in her possession, both the note and mortgage, and are still in her possession, or those acting for her; so that, when Mr. Kelley paid these amounts (presuming now that he had paid them), at these different times named, he paid them to St. John without requiring, as a condition of payment, that the note or mortgage should be there in order to have them credited on the note and mortgage, or to have the note and mortgage given up as paid and canceled.
There is no claim either in the pleadings or in the proof that Kelley in making these payments relied upon any agency of St. John for the plaintiff, because he said he didn’t know-anything about it, and, at least the claim is that he did not know anything regarding that, and that he believed St. John was the owner of the papers at the time. There is no claim of any act or deed on the part of Mrs. Hitchcock at or before the time of these payments, which should have led Mr. Kelley to believe that *810 St. John was the owner of the mortgage and' the notes, or was acting as her agent, except that the assignment to her was not placed on record, and such testimony given by St. John as I will hereafter refer to in brief. In other words, the claim on behalf of Kelley must rest alone on the assumption and clai mthat Mr. St. John was actually authorized as her agent to receive this money at the time he did receive it, and that although he did not have the note and mortgage, it would' make no difference if, in fact, he was actually authorized to receive that money for her, and that, undoubtedly, is so. If he had the authority, the mere circumstances that he had not then the proof of it present or the usual indicia could not be conclusive, that matter being simply a fact or circumstance bearing on. the question of the actual authority of the supposed agent.
We think there is no testimony tending to show that Mrs. Hitchcock authorized Mr. St. John to say to Mr. Kelley, nor to any one, that he was the actual owner of this note and mortgage. She did not authorize him to make such a misstatement. The testimony by which the defendant seeks to make out this claim that St. John was the agent and had actual authority, rests wholly on the testimony of St. John, the plaintiff having been adjudged insane. The testimony of St. John, so far as it tends to show that he had this authority, shows that it came about in the way of a conversation had between him and Mrs. Hitchcock, or various conversations, some of which he says were, as he thinks, in the presence of Mrs. Lutz, a daughter of Mrs. Hitchcock, and some of which, he thinks, were-when he and Mrs. Hitchcock were alone, and the question presented is whether under all the circumstances in this case, the proof offered is sufficient to make out the actual authority of St. John to do this business in this way. There was proof, however, to this effect, not only by St. John but by some others, that the husband of Mrs. Hitchcock died in the’ year 1881; that prior to that time Mr. St. John had transacted some business for the husband, the husband having some funds which he either loaned upon note or mortgage, or had Mr. St. John loan for him, and perhaps bought notes and mortgages. Upon his death the widow, Mrs. Hitchcock, began to transact this business. She had a number of thousands of dollars which she desired to keep invested in notes and mortgages in general, and Mr. St. John says that he transacted, almost wholly, the business for her; other evidence indicates that St John did from that time on until the time that his comparatively recent troubles occurred, transact a large amount of business for her. Generally he transferred to h.er — sold to her, notes and mortgages which had been taken by him in his own name, perhaps, he loaned money for her and took notes and mortgages, but whether at any time, in her own name, or always in his own name does not appear directly.
It also appears that on several occasions My. St. John was employed by her in making out her returns for taxation; that he did so at her request; and perhaps it is sought to be inferred from that, that it was her purpose to avoid taxation as much as possible, and that St. John was employed to make out returns instead of her making them out herself, with a view, in part, to this result, and perhaps this testimony was relied upon to indicate the close relation in business between her and St. John. So far it is claimed that the purpose was to avoid taxation. It is to be noted, that these returns were not introduced in evidence, and we have nothing upon the subject save and except the presumption, in the absence of proof to the contrary, that a party makes the returns truthfully and properly according to law.
The testimony also shows that on some occasion a party applied to Mrs. Hitchcock for the loan of some money- — $1,000, which she had, and. that notwithstanding the record had been searched by other parties, her- *811 relatives and good business men, and that she was assured that the loan was a proper one, yet she deferred making it until St. John, who was absent from the city, gave his advice upon it. But otherwise than this, the case on the part of the defendants rests upon the oral testimony^ of Mr. St. John, together with such evidence as is offered by a book which he brings into court and papers showing a large number of transactions between him and Mrs. Hitchcock.
The testimony of St. John bearing upon this question as to his direct authority to act, was, in substance, to this effect, that when he first began doing business for Mrs. Hitchcock in this way she told him that she wanted him to transact her business for her, attend to the loaning of money for her, and attend to the matters as if the transactions were his own, and that he might receive money from parties to whom loans were made, at any time, whether the obligations were due or not, in such sums as were offered, if he saw fit so to do, and that he should generally attend to the collection of her papers. He says that that conversation occurred at the beginning of his transacting business for her about 1881, and that other conversations, the terms of which he does not exactly repeat, but similar, in substance, he says, occurred from time to time after that. He says that from time to time he did this business for Mrs. Hitchcock; that he has generally sold her notes and mortgages, and although he transferred the notes and mortgages to her in writing, the transfers were never recorded, and that he was in the habit of receiving pay upon or of them, sometimes when she had delivered them to him for payment, and when he had them in his possession at the time they were paid, and sometimes when he had not the notes or mortgages in his possession, and that at such times when he received the money, having the securities in his possession, he would cross out the transfer to Mrs. Hitchcock when the mortgages were fully paid, and as he himself was the original mortgagee, he would write the release of the mortgage and sign his own- name, and that if that release were recorded it would be recorded in that way, not showing any assignment; and sometimes, if he received the pay in his own office, and the securities were not in his possession, but were in the possession of Mrs. Hitchcock, he would take the money to her, pay it over to her and receive the notes and mortgages, and sometimes in her presence or at her direction, at least, would cancel the assignment to her upon the mortgage and release it himself as the original mortgagee; and sometimes, he says, that these payments which were received by him when he did not have the papers, were upon instruments not yet due, and then he took the money up to Mrs. Hitchcock, and she would produce the papers and he would endorse the amount, if he had not paid in full, or would then receive from her the securities, if they were paid in full. He does not say that he had any special authority to collect the Kelley mortgage, but he speaks of it as if it came under this general manner of his doing business with Mrs. Hitchcock.
If this money was paid in June of 1891, it was never paid over to Mrs. Hitchcock, and the same is to be said of the payment of December, 1891. If St. John received it he did so either for himself or as the agent of Mrs. Hitchcock; he never paid it over to her; it has never been actually paid to her. First, as bearing upon the question of the actual payment; this was shown upon the trial: Shortly after Mr. St. John got into some financial troubles, Mr. Kelley applied to him to have these papers, and thereupon Mr. Kelley and Mrs. Kelley and Mr. St. John went up to see Mrs. Hitchcock regarding it. Mrs. Lutz, daughter of Mrs. Hitchcock, was there, and she and Mr. Lutz say that he was'also there. Mr. St. John says Mr. Lutz was perhaps there part of the time, but he is not certain whether he was there during all the conversation that occurred about these pay *812 ments, and the defendant, Mr. Kelley, also a witness as to this interview, says that Lutz was not there at all at the time the conversation occurred regarding these payments. Mr. St. John says that at the time he asked these papers to be given up because they had been paid to him for Mrs. Hitchcock, and he had given his receipts, and Mr. Kelley without giving details of the conversation, says that they went up there for the purpose of getting the papers. Mr. and Mrs. Lutz testified that at that time St. John said that he wanted the Kelley note for the purpose of having the endorsement of $100 thereon which had been paid to him; and Mrs. Lutz says that she thereupon said that when the money was paid over she would endorse it, but that the paper should not be delivered or presented for the purpose of making that endorsement until the money was actually paid over to her for Mrs. Hitchcock. Mr. Lutz also testifies to that, and upon rebuttal the first time, Mr. Kelley was called as a witness, and he testifies simply that nothing was said about the endorsement of a $100, but that he had a receipt for $150, but the receipt or receipts, if they were given, were not produced at the trial. *
Now{ if the statement of Mr. and Mrs. Lutz is true as to what happened at_ that time, it throws something of a doubt as to the actual payment of this money at the time it is claimed to have been paid, especially the $130. But I have mentioned all of the testimony, substantially, that bears on that point. Now, as to the authority: Suppose that we assume that these payments were in fact made, how should it be held as to there being actual authority. It appears from the testimony of all parties, that, if this general authority was given some years prior, Mr. St. John had lacked some of the usual accompaniments of such a close and confidential relation; that is, such confidential relations usually result in the agent’s keeping the secureties largely in his own possession, or in its being a matter of loose transaction whether he did have them or not, whether with receipts or without receipts. In this case it appears by the testimony of parties that Mrs. Hitchcock generally kept all her securities in her own possession. Now, suppose some years ago, say in 1881, she made the. general oral statement to St John, "If any party wants to pay, why, I will receive the money or you may receive it; and if, sometimes, they want to pay before due, you may take the money whenever it is paid, and if extension is wanted, why, the extension will be made.”
Ought that to apply to authorize the transaction that occurred in 1891 in the manner in which this transaction did occur, in the absence of the delivery of the securities? It is well known that the courts in dealing with these matters give great attention to the fact whether or not the security was in the possession of the collector. Ordinarily they hold that even if the collector has the right to collect interest, and to loan for the principal, he should be in possession of the obligation if he assumes the collection of it, and, in fact, the whole course of the decisions is of this tendency. The proof of the agency or authority to collect money in the absence of the security representing it, is held within very strict limits and bounds, and if had been simply upon this testimony alone, we should have grave doubts whether we should hold that St. John did have the actual undoubted authority of Mrs. Hitchcock to collect this money in the manner that he did, even if it were beyond peradventure that these statements were made by Mrs. Hitchcock at the times they were made. Still, he says, that many times he collected the money before it was due upon the instrument, and afterwards paid the money to her; he says that on such occasions he went to Mrs. Hitchcock’s house, asked for the securities, and had the money endorsed. But, he does not testify that, at such times, he told Mrs. Hitchcock, or that she knew that he had collected the money, representing himself as her agent in the matte.r, or that he simply came *813 tip as her agent, and for convenience to have the payments endorsed on the paper, but he simply presents himself at her house with the‘money on certain paper, saying so much or so much money has been paid, or I have the money to pay so and so, and therefore she takes it and allows the endorsement to be made in her presence on the securities.
Without going into detail and following up the transaction first spoken of, that was the general way transactions were done, and while the testimony was receivable and bears on the corroboration of the testimony of St. John, and shows that she authorized him to receive money without her knowledge at the time, and without having the security, and to actually give discharge for it, we think is doubtful. Now, there is another matter to be considered in connection with these matters that I have already stated, which still further justifies the claim made by the plaintiff.
As I have recited, the defendant Kelley does not claim that he thought St. John was acting as the agent of anybody, but that he claimed to be acting for himself, and that he was the owner of the paper. If St. John had, in fact, sold the paper to some person for whom he was not acting as agent, or pretending to act as agent, and Kelley paid to St. John, under the circumstances, in the absence of the paper, relying on St. John’s representations that he still owned the paper, he paid it at his peril.
Mr. St. John, at that time, not claiming or assuming to act as the agent of Mrs. Hitchcock, did everything that would seem to repudiate such an idea or repudiate such a relation, if in fact anyone might have claimed that it existed, as was stated in the case of Miller v. Sullivan, 39 O. S., in the opinion on page 8S.
I will also read the syllabus found on page 19:
“Where an agent enters into a contract without disclosing his principal or agency, the principal, if he takes advantage of the contract, must .do so subject to all the rights and equities, of which the other contracting party, who had no- knowledge of the agency, might avail himself as against the agent assuming the latter to be principal.”
It is also held by the courts that while a party may pursue an undisclosed principal, when discovered — or if the agent contract in his own name for an undisclosed principal — he may pursue the agent, yet if he act with a full knowledge of the agency and principalship, he can not ordinarily pursue to judgment and satisfaction-, or even to judgment, both of them. If, with the knowledge that there is a principal, when he has fully discovered that, and who the principal is, the contract being in the name of the agent alone as agent, if the party elect to pursue the agent, he can not afterwards pursue the principal.
Now, a contract or agency has the general features of contracts in general. It is a contract establishing a certain relation between- the parties; it is a contract of one with the other that he allows him to act as his-agent; it is the contract of the other that he will act as the other party’s-agent, but either party may, in general, dissolve that agency; the principal may discharge the agent, or the agent may cease to act for his principal; he may repudiate this relation and refuse to exercise the powers it confers.
‘ Now, in this case, Mr. St. John, when he came to pay to Mr. Kelley, declared himself to be the owner of the note, and this apparently repudiated the idea of his being agent of anybody. The fact that he hed received the money in- 1891, and that he had not treated it as the agent of Mrs. Hitchcock,anddidnotpayitover to her, and did not report it to her, would seem to indicate that he treated it as his own money. He treated the pay *814 ment of December, 1891, in the same way; and not only that, if he did receive it as the agent of Mrs. Hitchcock, he, of course, held it as her agent, and he was not at that time chargeable with the payment of the interest as her agent, at eight per cent.; the paper which was thus taken up was paid; it was in fact satisfied, so that it no longer existed as a contract, and Mrs. Hitchcock, through her agent, was in possession of the money, yet St. John from time to time after that, for two years, reported that he did receive the interest at eight per cent, upon Kelley’s obligation, paid it over to Mrs. Hitchcock, and had it endorsed, both in 1891 and 1892. If he was an agent of Mrs. Hitchcock’s, or ever authorized to receive this money, it would seem that at the time that the payment was made he did not exercise his powers as agent, but acted in a manner to repudiate that agency, and not only at the time of the payment, but afterwards.
J. T. Marshall, for Plaintiff.
S. Scott, for Defendants.
Mrs. Hitchcock is not held in any manner or by any principle of estoppel bound to acknowledge these payments, or to_ acknowledge that Mr. St. John was her agent to receive the money or discharge the obligation. We think that under all these circumstances, considering the action of St. John in receiving the money in the manner he did receive it — in receiving it for himself, for his own use, claiming to b ethe owner of the paper, and Mr. Kelley paying it to an unauthorized person who had not the securities — we think these losses, although it is a grievous misfortune, should fall on Mr. Kelley instead of Mrs. Hitchcock, and the finding and the decree will be for the plaintiff for the foreclosure of the mortgage for the amount claimed.